IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL INDICTMENT** |
| v. | **NO. 3:10-CR-00006-TCB-GGB** |
| **EDGAR PAGAN-TORRES,** | |
| **Defendant.** | |

### FINAL REPORT AND RECOMMENDATION AND ORDER

Defendant Edgar Pagan-Torres ("Defendant") is charged with transporting child pornography from Puerto Rico, using a minor to engage in sexually explicit conduct, and possession of child pornography, in violation of Title 18 United States Code Sections 2251(a) and 2252A(a)(5)(B). Pending before this Court is Defendant's Motion to Suppress Evidence (Doc.17).[1] I held an evidentiary hearing on this motion on August 16, 2010. (Doc. 24.) All transcript references are to the transcript of that hearing. (Doc. 25.) Following the hearing, the parties submitted their briefs regarding the motion. (Docs. 26 and 27.) For the reasons discussed below, I recommend that Defendant's Motion to Suppress Evidence (Doc. 17) be **DENIED**.

---

[1] Defendant also filed a "Supplemental Motion to Suppress Evidence" (Doc. 26), which I construe as a brief in support of his motion to suppress.

AO 72A
(Rev.8/82)

**I.     FACTS**

In October 2009 the Army Criminal Investigation Division ("CID") in Puerto Rico notified Erik Duncan, an Army CID agent stationed at Fort McPherson in Atlanta ("Agent Duncan"), that Defendant, a lieutenant colonel in the United States Army, was the subject of a child molestation investigation by Puerto Rican authorities. Tr. 5-6. Defendant and his family had previously lived in Puerto Rico. However, in the fall of 2009, Defendant was stationed in Atlanta, and he was living with his daughter and his wife, Army Captain Maria Marrero, in Peachtree City, Georgia. Because Defendant was stationed in the Atlanta area at the time the allegations arose, Agent Duncan was assigned to investigate whether there was evidence in Georgia of any criminal activity. Tr. 7-8.

On October 8, 2009, Agent Duncan contacted Captain Marrero to arrange an interview of her about the molestation allegations. Tr. 8. Captain Marrero agreed to meet Agent Duncan at the Army CID office at Fort McPherson. Tr. 9. At the conclusion of his interview with Captain Marrero, Agent Duncan asked Captain Marrero for consent to search the home that she shared with Defendant and their daughter. Tr. 10.

Captain Marrero consented to a search of the home and signed a consent to search form. Tr. 12, Ex. 1. The form authorized Agent Duncan to search the family home located at 828 Richmond Circle in Peachtree City, Georgia, "and all associated storage rooms and spaces." Tr. 12-13, Ex. 1. Captain Marrero further authorized Agent Duncan to search for, remove, and retain certain items, including computer hard disk drives, removable storage media, data storage devices, photographs, and movies found inside the property. Tr. 14-15, Ex. 1.

After concluding the interview with Captain Marrero, Agent Duncan, along with Army CID Special Agent Shaun Galloway, drove to Captain Marrero's and Defendant's home in Peachtree City. Tr. 16. Captain Marrero drove herself separately to the property. Id. Defendant was not present at the home.[2] When they arrived at the home, Captian Marrero invited Agents Duncan and Galloway in the house and gave them a tour. Tr. 16, 79. Although Agent Duncan searched the entire property, he ultimately focused his search on a second floor office ("the office") where most of the computers and related items appeared to be stored. Tr. 18-19. Captain Marrero referred to this room as "his [Defendant's] room." Tr. 21, 44. Captain Marrero told

---

[2] Defendant may have received a "no contact" order that day that prohibited him from having contact with his wife or the home. Tr. 42, 75, 79.

Agent Duncan that Defendant had a keen interest in computers and that he had many computers and computer related items in that room. Tr. 15-16.

The office had two doors – one that led to the main upstairs hallway, and one to a bathroom, which connected to the daughter's bedroom. Tr. 19, 44, Ex. 2. The door leading from the hallway to the office was open and unlocked. Tr. 20.

The door to the office was kept unlocked, and Captain Marrero kept some of her own items, such as scrap-booking materials, in it. Tr. 45, 81-82. In addition, family financial records, family movies, commercially produced videos, pictures, books, and board games were kept in the office. Tr. 22, 81. Captain Marrero could enter the office whenever she wanted to do so, and she occasionally entered it to retrieve something. Tr. 21, 83. However, for the most part, Captain Marrero chose not to enter that room because she did not like to see the mess in the office. Tr. 85. Defendant never told his wife not to enter or not to take things from the office. Tr. 88.

Inside the office were multiple computers, shelves containing DVDs, CDs, and VHS video cassettes, and numerous other items. Tr. 21. Captain Marrero never accessed the computers in the office. Tr. 86. She had her own computer elsewhere in the home. Tr. 21, 46, 83, 86, 96. She believed Defendant's computers were password protected, and she did not have the passwords. Tr. 88, 97.

4

AO 72A
(Rev.8/82)

Agent Duncan seized all computers and data storage devices from the property, most of which were found in the office. Tr. 20, 22, 24. Agent Duncan also seized all the DVDs, CDs, and VHS video cassettes he found in the office with the exception of recordings that appeared to be commercially produced. Tr. 22-24. Agent Duncan seized between six and eight computers, numerous external storage devices, and a substantial number of CDs, DVDs, and VHS video cassettes from the office. Tr. 21. Some of the CDs, DVDs, and VHS video cassettes were labeled, and others were not. Tr. 22-23. Agent Duncan found these items, apparently unorganized, all over the office, including on the floor, on the desk, on shelves, and inside cabinets. Tr. 21, 32. None of these items was hidden or located inside a secure or locked cabinet. Tr. 32-33. Similarly, none of the computers or other electronic storage devices that Agent Duncan seized from the home was stored inside a locked drawer or cabinet. Tr. 33. During the time that Agent Duncan was in the home, Captain Marrero never withdrew her consent or indicated that she lacked authority to allow Agent Duncan to seize or search any item. Tr. 24-25. There were no parts of the house, rooms, or parts of rooms or floors, that were off limits to Captain Marrero or her daughter. Tr. 73.

Although Agent Duncan did not recall the date on which he discussed this issue with Captain Marrero, he testified that he specifically asked Captain Marrero about her

5

access to the video cassettes. Tr. 61, 64-66. Based on that conversation, he concluded that the cassettes were jointly-used property. Tr. 51, 53, 59-61, 64-66.

On October 9, 2009, the day after the search, Captain Marrero executed a second Consent to Search form authorizing Agent Duncan to search, among other items, the computers, data storage devices, and other items seized from the home. Tr. 26-28, Ex. 3. Although Captain Marrero consented to a search of all of these items, Agent Duncan became concerned that Captain Marrero's consent may not have been legally sufficient to view the digital items. Tr. 49-51. On December 4, 2009, he obtained a search warrant to view all items seized except for the VHS video cassettes. Tr. 29, 32, 49, 51. Agent Duncan did not search any computer, data storage device, or other electronic media (with the exception of the VHS video cassettes) seized from the home prior to obtaining this search warrant. Tr. 29-30. He did, however, rely in part on the contents of certain VHS video cassettes recovered from the home on October 8, 2009, in order to obtain the search warrant. Tr. 30, 63, Ex. 5.

## II.  **<u>DISCUSSION</u>**

Defendant requests that the items seized from the office be suppressed, and any evidence obtained from the subsequent search warrant also be suppressed, and argues that Captain Marrero did not have the authority to consent to a search of the room that

6

Defendant used as a home office or the contents of that room. The Government maintains that Captain Marrero had equal access to and authority over the office and the items inside the office, and she therefore had authority to consent to the search of the office and search and seizure of the items therein.

A search of a defendant's property based on the consent of a third party is valid if the third party had common authority over the premises. See United States v. Matlock, 415 U.S. 164 (1974). In Matlock, the defendant jointly occupied a bedroom with Gayle Graff in the home of Ms. Graff's parents. At the time of the defendant's arrest for bank robbery, the arresting officers knew where the defendant lived but did not ask him for consent to search his room. Instead, the officers went to the house and asked Ms. Graff for consent to search. She consented to a search of the house, including the bedroom that was jointly occupied by the defendant and herself. The officers searched and found a large amount of cash in a diaper bag in the only closet in the room. The Supreme Court held that Ms. Graff's consent was sufficient because she "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." Id. at 171. The Court explained that common authority is not derived from the law of property –

> but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is

7

> reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n.7.

Matlock has frequently been applied to validate warrantless consent searches in situations where a person with access to, and a degree of control over, a room occupied by another person consents to a search of that room.

For example, in United States v. Duran, 957 F.2d 499, 503 (7th Cir. 1992), the defendant argued that his wife could not consent to a search of a farmhouse on their property because she believed that the space was his private gym, she never went into the farmhouse, and the police did not find any of her items inside the space. The Court rejected this argument, finding that the defendant did not have exclusive dominion over the building merely because his spouse chose to not use the farmhouse or leave her items in the location. Id. at 504-5. The Court pointed out that "[o]ne can have access to a building or a room but choose not to enter." Id. at 505.

In United States v. Harrison, 679 F.2d 942, 947 (D.C. Cir. 1982), the defendant contested his wife's authority to consent to a search of a jointly used storage space in their basement where police found marijuana in two closed boxes. Id. at 945. The Court

8

found that the defendant's wife had authority to consent to a search of that space, along with the closed boxes, stating:

> In the instant case, Mrs. Harrison had full "common authority" to the storage area in the basement. That area was unlocked and open, and contained personal items that belonged to both appellant and his wife. The boxes were not sealed or taped and were closed only by "criss-crossed" flaps. Moreover, the record provides no indication that the boxes were marked in any way indicating appellant's ownership. Nor is there anything in the record to indicate that appellant ever asserted that the boxes were exclusively in his control or even that they were his personal effects. . . .
>
> Under the circumstances, we find that Mrs. Harrison had full authority to release the boxes of marijuana into police custody, viz., she fits fully within the "common authority" criteria enunciated in Matlock. . . .

Id. at 947.

Duran and Harrison demonstrate that it is not necessary for the consenting third-party to have primary control over the premises searched or unlocked items in order to possess authority to consent.

There are situations in which persons who share a residence may retain areas or items of exclusive control to which their co-occupants may not effectively grant consent to search. "A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home." United States v. Karo 468 U.S. 705, 725 (1984) (O'Connor, J. concurring); see also United States v. Waller,

9

426 F.3d 838, 846 (6th Cir. 2005) (finding consenting third-party did not have common authority over closed luggage in his apartment belonging to another person); United States v. Block, 590 F.2d 535, 542 (4th Cir.1978) (finding that mother did not have authority to consent to search interior of son's footlocker).  However, this is not one of those situations.

The Government has sufficiently shown that Defendant did not retain exclusive control over his office or the items in the office.  The office was not locked, it contained some joint property, Captain Marrero kept some of her personal items in it, and Captain Marrero was free to enter as she wished.  Because Captain Marrero had access to and a degree of control over the office and the items inside the office, she could properly consent to a search of the office and seizure of the items in it.

The only items to which Defendant arguably retained exclusive control were the contents of the computers in his office.  However, these were not searched until after a search warrant was obtained.  Defendant argues that the VHS video cassettes upon which the search warrant was based were also under his exclusive control.  However, I credit the testimony that these video tapes were jointly used property. Tr. 53, 59-61, 64-66, 100-01.  Moreover, unlike the computers, the VHS video cassettes were not password protected and could be accessed by Captain Marrero whenever she wished.

10

Therefore, Captain Marrrero had authority to authorize the search of the VHS video cassettes.

### III. CONCLUSION

For the reasons stated above, I **RECOMMEND** that Defendant's Motion to Suppress Evidence (Doc. 17) be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

**IT IS SO ORDERED** and **RECOMMENDED**, this  15th  day of November, 2010.

*Gerrilyn G. Brill*
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE